May it please the court, my name is Gail Galante and I represent the Appellant Cardinal Health. The commission's decision should be reversed and the claim for compensation should be denied. Petitioner failed to prove that she sustained a repetitive trauma shoulder injury, consisting of an aggravation of her degenerative arthritic shoulder. Instead, the respondent proved that she did not perform repetitive shoulder work and that there was no medical causal connection. This case really involves the failure of proof, the meaning of manifest word, and the lack of evidence to support the claim. The only evidence that the petitioner offered to support her claim was her own testimony, and her testimony was inconsistent and contradictory. Kennedy, let's hold that point for a second. What about the testimony of Drs. Perez, Luke, and Terry? Did they not opine that her work was repetitive in nature and that her injuries arose out of it in the course of her employment? How do we ignore those doctors' findings? Those doctors did not testify at all. The only medical evidence offered by the petitioner were the medical records of Drs. Perez, Dr. Terry, and Dr. Luke. And what do those records indicate? And all those records say the petitioner gives her history. So these doctors are reciting what she said, and they all said different things. One of the doctors, she said, I packed. One of the doctors, she told them she lifted. One of the doctors, she said, well, I do repetitive work. Well, of course she's going to tell them she does repetitive work, because that's what she's been saying all along. But that's just what she said. And these doctors merely wrote down what she said, and that's what their records say. Dr. Luke did not opine that the claimant's shoulder condition was either caused by or accelerated by the type of work that she was doing? I did not see that in any of the medical records, Your Honor. I did not. The petitioner did not offer, like, a separate medical report, which you often see and you usually see in these kinds of cases, where the Respondent put in all the evidence. The Respondent put in a medical record. Well, we'll have to ask your opponent. So basically you're representing and saying that all the medical reports said was what the claimant said. The doctors expressed no opinions about anything, correct? Yes, Your Honor. That's exactly what I'm saying, that there was no independent causal connection opinion in any of the medical records of the doctors. There was no independent medical report by any of the petitioner's doctors who opined as to causal connection, and there were no medical depositions. There was nothing in there. There wasn't even a description of her job duties, and Commissioner Basurto, the dissenting commissioner at the commission, specifically noted that, that there was just nothing in the medical records other than the petitioner's own statements, which is, again, the house of cards upon which the petitioner's case was built. She says it's so. She said she raised her arm at or above her shoulder level, and that's what it is. And she told her doctors that's what she did. And so, ergo, she's entitled to benefits. And that's just not the law. So what did Dr. Luke say? Dr. Luke, whatever she told him, she told Dr. Did Dr. Luke give an opinion? No, Your Honor. He merely recited her history. I did not see any opinion, any medical opinion, separate opinion by Dr. Luke as to any kind of understanding of her job. He didn't have a job description. There's no detail in there that she, you know, she was reaching for the stream feeders or the things that she even testified to that she claimed were the activities that she performed, which she didn't. So what she had in her case is only her testimony and only her statements to her doctor. And in contrast, the Respondent offered voluminous mountains of evidence showing that her job did not involve repetitive activities at or above shoulder level. The Respondent offered medical, testimonial, visual, documentary, and demonstrative evidence that she did not perform work at or above shoulder level. And when you balance those against her self-serving testimony that she did, clearly the manifest way to the evidence is on the side of the Respondent. The first thing you have is the Petitioner's demonstrations. And she showed what she did in front of the arbitrator on numerous occasions over several days of trial. And the arbitrator observed several times, honestly, she's not reaching above her shoulder. Now, when the arbitrator made these observations, it's very significant that the Petitioner did not object. The Petitioner's attorney did not object and say, you know, and if there was an objection that she was reaching above her shoulder, and this is customarily done, you'll say, well, you know, objection, Your Honor. It does show that she's reaching above her shoulder. And it's not there. It's not in the record. So it's unrebutted. These unrebutted observations by the arbitrator that she was not reaching above her shoulder. Secondly, you've got the testimony of Gregory Hamburg. And it was long, technical testimony. He testified in very great detail about the measurements of the workstation, the heights of the tables, the distances that the feeder is from the table. It's very, very technical. But what his testimony showed was the ergonomic design of this assembly line. This is not a sweat plant. This is a very ergonomic, modern. It's undisputed that she had a repetitive type job. It is undisputed that the job is assembly line, fast paced. And she had, I don't remember how many pieces an hour or whatever she had to perform. Do you remember what it says in the record? It's many. No question, it's a repetitive job. Your entire argument is based on she couldn't have been harmed unless she was reaching above her shoulder. Exactly. And there's no dispute as to that. This whole case involves what was she, did her job involve at or above shoulder work or not? And the fact that she was using her hands a lot, this is not a hand case. And maybe if it was, we wouldn't be here. And the job description says that she did reach outward, not above the shoulder or at the shoulder, but this way. But we don't have that kind of case here. We have a shoulder case. Excuse me. Does all the medical testimony in the case say that she could not have had this injury unless she was reaching above her shoulder? No, because it's degenerative arthritis. And that's the whole issue here, that there's no question that this is a degenerative condition. And Dr. Sagerman's testimony in that respect is unrebutted. I guess, to kind of clarify and follow up on Justice Stewart's question, yes, you're saying it's degenerative. But let's take a hypothetical where there's no degenerative arthritis present. The mechanics of injury that she would, if it's not degenerative, the mechanics of injury would have to be overhead lifting? At or above the shoulder. That's the testimony. It would have to be at or above the shoulder repetitive work. Where does that testimony come in at? Who's giving that? Dr. Sagerman. Dr. Sagerman. Yes. The only doctor who testified. Yes. And the only doctor who examined the biomechanics of the job. And the petitioner's testimony. He is Section 12. He's a Section 12. Employer's Section 12. Yes. And he's an expert in hand and shoulder conditions. And so that's, absent degeneration, that would be the only way the condition of ill-being the hypothetical person would have, that would be by that mechanic of injury. Mechanics, right? Biomechanics of injury. You know, we didn't address an acute injury because this case involved arthritis. Dr. Sagerman testified about the mechanics of the shoulder and how you would cause or aggravate a condition of the shoulder and the type of how you have to have a particular kind of shoulder movement in order to cause that condition. Yes, Your Honor. And that was the testimony of Dr. Sagerman. Dr. Sagerman. Because that's how the petitioner was proceeding. Is there a problem with the testimony of Dr. Sagerman? Didn't the commission specifically find, quote, Dr. Sagerman's opinion denying causal connection is based on incomplete and inaccurate information regarding the petitioner's job. Didn't the commission specifically find that? Well, the commission said that, yes, Your Honor. And then that all comes down to, well, what does this job involve? And it's all coming down to the fact that the petitioner said she reached at or above her shoulder. Okay. What did you have on your side of the ledger to say that that wasn't the case here in her complaint? Well, first, we had the petitioner's own demonstrations. Many times during the record, the arbitrator noted that she demonstrated what she did. She was not reaching at or above her shoulder. And those are unrebutted. The petitioner's attorney didn't respond. What else? Secondly, Gregory Hamburg's detailed testimony about the measurements and the ergonomic design of the workstation makes it very clear that none of these, that the entire workstation was set up so that you did not raise your arm at or above shoulder level. Everything was adjustable. The tables, the chairs, the stream feeders that she allegedly had to reach overhead for. This was so perfectly designed that a person couldn't enter their shoulder. This is not shoulder jab. I mean, when you look at the films, this truly is not a shoulder jab. As I said, if this was hands or even, you know, possibly elbows but not shoulders. Okay. What else do you have? And what's interesting about Mr. Hamburg's testimony is there's no cross-examination at any point of the petitioner's attorney or the petitioner saying, well, you know, isn't it true that, you know, at this point you would have reached at or above your shoulder? It's not there. The other thing that's interesting is the commission, you know, the petitioner never testified on rebuttal, and there's a lot of testimony in this case. She came up on rebuttal, and she never testified on rebuttal that she didn't adjust the equipment. Because all of this equipment can be adjusted so that when these, from the stream feeder, when the stuff is falling on the table, you're just grabbing it. I'm still there dealing with, what's his name, Hamburg? Hamburg. But she never testified she didn't. So the assumption is that she did. She adjusted. We have that. The DVD video. Oh, okay. The DVD video. Let's go on to the other. And that was watched during the arbitration, in front of the arbitrator. And it was narrated by Mr. Hamburg. And at no point does anyone notice, note that there's any over, at or above the shoulder activity. Are we glossing over something again? Let's look at the record. Didn't the petitioner specifically testify the job description that was presented by the Responder was inaccurate and incomplete, and that the job analysis was not prepared with her involvement? Was it? It was her testimony, but again. Okay. Why can't the Commission, can't this boil down to a very simple fact? Can't the Commission believe her and not anybody else? Is there any legal impediment to resolving the case on their basis? Yes. Because when her testimony is inconsistent and not corroborated and against, it's sort of like, well, she can get up and say the sky is orange. And if all the other evidence says that the sky is blue, we have to believe it's orange because, because. Well, the Commission obviously did. And is it our function to re-weigh the evidence? Are we precluded from re-weighing the evidence and substituting our judgment for that of the Commission? Yes, you are. And that's, and I'm not asking you to do that. What I'm, that's why this case really involves what is manifest weight? Can the petitioner just get up there and say it's so? It is so. And the respondent comes in with a truckload of evidence that shows that her job did not involve shoulder work. I was trying to get to that truckload. Yes. I have a DVD. What else do I have besides the DVD? We have the job analysis, which is totally consistent with the DVD. You know, Steve. And the respondent's preparation. Obviously, the petitioner had no involvement in constructing this DVD, did she? No, she didn't. So how do we know it's based on fact? Because she testified it was. She testified that the video accurately depicted her job duties, because basically every line is the same when she said that. They're all the same, and it accurately depicted the reaching, the job setting, the way the workstations were set up. The only thing was she said this is a very slow line with all the old ladies on it. So the only difference is that the line, that it was slower. So all that would mean is that you were faster with your fingers or faster with you're below the shoulder. But there was no overhead. There was no at or above the shoulder. Can you tell me what Dr. Luke's report said, Plaintiff's Exhibit 7? I did not in the record. All I saw were Dr. Luke's records. He did state, yes, the patient's work with repetitive motion has aggravated this. But what does he base it on? Wait a minute, wait a minute. Let's go a little bit further. What else does he say? 1099 and 1101. What else does he say? Your Honor, I don't have the whole record with me.  But he does note at 1099 to 1101 that her diagnosis was? Secondary pain due to AC joint arthritis due to work. Due to work, yes. And what was that work? Yeah, but you told us, you represented there was no opinion. Dr. Luke on page 1101 he opines that the shoulder pain was a direct result of the type of work she performed. But what is the basis for that? But whether or not there's an adequate basis and whether or not somebody gave that opinion, you don't see they're two totally different things? I don't see that that's a causal connection opinion. It's not a causal connection opinion. Who could have said that? It's not a causal connection opinion. Come on. Come on. Well, when all she's saying is she tells him I do repetitive motion and he bases that opinion, I don't think that that is sufficient to tell us what. Again, it's there. It may not be sufficient, but you can't represent it's not there, can you? That is what the doctor said. That is what he said, yes, Your Honor, that her repetitive, her work with repetitive motion aggravated it. But it still doesn't show us what is that repetitive motion. And is it truly, and it gets us back down to what do you need to prove the case? I think a reasonable possibility is that it's a repetitive, a repetitive trauma injury when all that the Petitioner has is her own testimony. And the Respondent ought to. Counsel, we'll have time for rebuttal. Thank you, Your Honor. Good afternoon, Your Honors. Counsel, Edward Zappel on behalf of the Appellee. Counsel, in the course of your argument, could you expand the Counsel's earlier argument there was no medical evidence to support this claim? My brief points out the three treating physicians, all of which treated the Petitioner here, all opined and all provided evidence that the repetitive work activity was the causal connection to her repetitive shoulder injury. Dr. Perez points out, Petitioner's Exhibit No. 6, page, in the Record 1048, that she did repetitive work activity pulling 12 hours of four days a week. And by the end of the day, she had a lot of pain and was unable to lift her arm. He opines that he diagnosed her with the work-related injury of the right shoulder, right shoulder tendinitis versus bursitis. That's 1048. Dr. Luke had also opined that the Petitioner's shoulder pain is a direct result of the type of work that she does. Same history. Every time she saw a physician here, it was the same repetitive work activity that she did on this Production Assembly line. The last treating physician was Dr. Terry. Again, the same history of repetitive work activity. He's the physician that actually did the repair. What are those opinions worth, though, if the description of what the claimant does is not an accurate description and they're using their medical expertise based upon a description given by the claimant? I mean, what is it? I mean, are they giving an opinion based on something that is not, in fact, the case? And so could that opinion be worth anything? I think the way the Commission resolved that issue was by looking at this job description. This written description that the Section 12 physician, Dr. Segerman, relied upon was deemed by the Commission to be flawed and inaccurate and not an accurate representation of the work activity that the Petitioner did. And they based that for two real reasons that they bring out in their decision. The job description says she does absolutely zero work activity above her head. Clearly, her evidence was unrebutted and uncontradicted that when she takes those shipping boxes off the end of this Production Assembly, they stack these 36-inch boxes three and four high. So at the third or fourth level, she clearly would be, she's about 5'3", she would clearly be lifting above her head. Job description says that activity doesn't exist. The other discrepancy that was fundamentally... Opposing counsel makes much out of adjusting all of the apparatus there that she's working on. Would an adjustment make any difference? It may have. But there is no evidence that the Petitioner was ever aware that these two stream feeders that exist along the production line could have been adjusted. There's no evidence that the Petitioner was ever afforded a chair, despite what Mr. Homburg said. The production operation manager apparently did set up some of these lines. There's about 30 different rooms, and there's a number of sequences and lines within the various products that go along this pharmaceutical company. But he never testified that the workers did not stand at these tables to do the activities. That's what Petitioner testified to. She did not have a chair when she was sitting from the first position and taking that vial of liquid pharmaceuticals and hold it up to the light to see if they were leaking. She didn't have a chair, as the video suggests, when she reaches to the stream feeder 300 to 1,200 times per hour to take the written insert from the stream feeder. Position number four on the line, where she's got 300 to 1,200 cardboard boxes coming off the second stream feeder, she did testify, this 5-foot-3-inch woman, that she had to reach shoulder level to reach these boxes 300 to 1,200 times per hour. The numbers are staggering, what they did for production. And those were corroborated by Mr. Homburg, how they synchronized this blow-fill-seal machine with the production of these vials across this assembly line. They processed 7,200 vials per hour, a staggering 79,000 vials over an 11-hour shift. That may be all well and good. It has probably little to do with the fact of the mechanics of injury, though. Seemingly, this record seems to think that somewhere along the line, that this injury can only occur if it's at shoulder level or higher, right? Treating physicians don't ascribe to that position. But even if we were to take Dr. Sagerman's testimony for its uncontradicted truth, that you need to have shoulder activity or above in order to create this condition. But he's the only doctor that says it has to be that way. Correct. Even if we were to take it at face value, the arbitrator states, as the commission clearly points out, that these two positions along the production line, the first feeder and the second feeder that she meets, where she's reaching at that level between 300 and 1,200 times per hour, that she's at the first position exactly at mid-neck level, page 77 of the record. And at the second display box with the stream feeder, she's again reaching, as she demonstrates, at, quote, eye level. That's page 82 of the record. So even if we look at Dr. Sagerman's opinion, the evidence is ample that this woman had repetitive work activity where she's reaching at shoulder level or above. I think the evidence is overwhelming. Treating physicians did not have to create some sort of report to substantiate their opinions for causal connection. It's there by way of the history. The history is consistent by the petitioner. And this job description is not accurate. And that was the basis of Dr. Sagerman's opinion. He conceded. He didn't know the frequency for which she did any type of lifting at the shoulder level. But if she did it on a frequent basis, that would be a competent cause for compression to the subacromial area and would be a competent cause for her underlying injury. So I think at the end of the day, the record's ample and replete with evidence to support. Can you help me out with something? Your brief and your opponent's brief both say that this woman worked for an entity called Cardinal Health 400 Incorporated. Who's Automatic Liquid Packaging Incorporated and who's Sedgwick Claims? Sedgwick Claims is the third-party administrator for Cardinal Health 400. They had a change in their corporate identity. I don't know when that took place, but at the time that I filed it, I named both of those entities as respondents. Is there an also known as? They're both corporations, so I don't believe it's a DBA or an AKA. I don't recall the timing as to when Cardinal merged into Automated Liquid or vice versa. So it's really an FKA. Possibly. Sedgwick, at all times, regardless of whether it was Cardinal Health or Automated Liquid, was the third-party administrator handling the file. Thank you. Thank you, Tom. Rebuttal, please. The discussion about the shipper position, the shipper position is the last rotation, and she would so infrequently have to put the box on that location that it would definitely not be repetitive. And based on the heights of the box, and, again, this all goes to the heights of the boxes and the sizes of things, that at best she'd be reaching occasionally at shoulder level, and that's certainly indicated in the job analysis. Well, the commission recognized that, didn't they, when they said that the particular job involved work at or above shoulder level, it was significantly more repetitive and frequent than the occasional task being given it to by the employer's job description? Right. That was the heart of the commission's, you know, decision, is feeling that the job analysis was not accurate, and it does accurately describe her duties. Who decided whether that's accurate or not? Well, I mean, it's concerned ‑‑ it wasn't rebutted, it wasn't challenged in terms of any objective way by the petitioner, other than her saying that she did reach above her shoulder. When you look at the films, the films are totally consistent with the job analysis, and that's why when you have these conflicts, if you're looking at the job analysis and looking at her own demonstrations, and I think those are so important because it makes her testimony totally contradictory and inconsistent, because she was not ‑‑ she was showing the arbitrator what she was doing, and it wasn't. But the doctor, the only doctor to address causal connection and describe the specific types of biomechanics that could cause this particular condition is Dr. Sagerman. The petitioner's attorneys, the petitioner's doctors did not address that. And so we're left in the dark as to what the basis ‑‑ Pardon? The commission didn't think much of Dr. Sagerman. They didn't. They certainly didn't adapt his opinion. No, Your Honor, they did not. And the problem with the failure of proof on the medical causal connection issue from the petitioner's perspective is that none of the doctors who described the petitioner's job duties, there's no ‑‑ it's not even ‑‑ when you look at the records, there's no indication that she does the type of work that she testified to. So the medical records of the treating doctors do not enlighten us, establish or prove the petitioner's case. And in contrast, if you look at Dr. Sagerman, he's the only doctor who explained the biomechanics of the condition, the activities that would be needed, and why her job did not cause her or aggravate her expedition. And therefore, I would ask that the commission's decision be reversed. Thank you, counsel.